### THE YUMA.

### THE MAURICE B. GROVER.

### THE JOHN MARTIN.

(Circuit Court of Appeals, Second Circuit. August 16, 1904.)

#### Nos. 179, 180.

1. COLLISION—VESSELS MEETING—STEAMER AND SCHOONER IN TOW.

A schooner passing down the St. Clair river in tow and a meeting steamer both *held* in fault for a collision between them; the former on the ground that she failed to follow the towing steamer, and the latter on the ground that she should have sooner observed the course of the schooner and avoided the collision by giving more room, and also because, as found by the trial court on conflicting evidence, she sheered toward the course of the meeting vessels after passing the towing steamer.

2. SAME—VIOLATION OF RULE.

A steamer descending the St. Clair river with a tow, although she failed to obey the then recently issued order of the War Department, which required her to keep on the western, or American, side of the channel, but signaled an ascending steamer her intention to pass starboard to starboard, and passed down on the range line in the center of the channel, *held* not, for that reason, in fault for a collision between her tow and the ascending steamer, where the latter assented to the signal, and there was ample room for her passage between the course of the descending steamer and the western side of the channel.

Lacombe, Circuit Judge, concurring on the ground that the question of fault for violation of the rule was not raised by the pleadings.

Appeals from the District Court of the United States for the Western District of New York.

For opinion below, see 117 Fed. 894.

The collision occurred in the St. Clair Rapids, at the outlet of Lake Huron, September 21, 1900, between the steamer Yuma and the barge Martin, which was being towed by the steamer Maurice B. Grover. The Yuma received some injury, principally to her starboard bow, amounting with interest to date of decree, to $4,962.48. The Martin was sunk and, with her cargo, became a total loss. Her master, mate and two seamen were drowned. Her damages, with interest, aggregated $32,701. The District Court found the Yuma and Martin both in fault, the former for sheering to starboard just previous to the collision, the latter for not following her steamer and for being too far to the westward of the steamer's course. A decree was entered dividing the damages and costs. All of the important witnesses, 26 in number, were examined before the trial court; the testimony of Cristner, a marine reporter, and Pettersen, a seaman, on the Martin, were taken by deposition. Both parties appeal. The facts are fully and accurately stated in the opinion of the District Judge. 117 Fed. 894.

Harvey D. Goulder, for the Grover and the Martin.
John C. Shaw, for the Yuma.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

COXE, Circuit Judge (after stating the facts). The issues of fact presented on this appeal are difficult and perplexing. There is no decisive preponderance of testimony upon any of the questions discussed. The witnesses were all, apparently, honest and gave truthful versions of the facts and circumstances which came under their observation, but there is a sharp conflict upon almost every salient point. It is peculiarly a controversy, therefore, where the findings of the trial judge, who saw and heard the witnesses, should not be disturbed unless clearly erroneous.

We concur in the findings of the court below that the Yuma sheered to starboard as she passed the Grover. The master of the Yuma testifies that when passing the Grover he discovered that the Martin had swung across his course so that she was three or four points out of line with the Grover and towards the American side of the river. If this version of the transaction be correct, when the boats were but 900 feet distant the Martin had sheered or drifted directly across the Yuma's course. There can be no pretense that this movement of the Martin was instantaneous; descending as she was, it must have been gradual and plainly discernible from the deck of the Yuma, the danger becoming more and more imminent as the boats approached each other. And yet the master of the Yuma says that he saw nothing alarming until his bow was approximately abreast of the Grover's stern. It seems impossible to escape from the dilemma in which this testimony places the Yuma. Either she sheered across the Grover's course, as the latter contends, or she failed to notice that the Martin was drifting across her course until it was too late to avoid a collision. In either event she must be faulted. She was under complete control and responded instantaneously to every movement of her helm.

There is testimony that in the vicinity of the collision the current is swift and disturbed by eddies and cross-currents, but thousands of boats pass up and down annually and there is no doubt that a careful and prudent navigator with a boat easily handled can, passing up the channel, overcome any tendency to sheer, by giving careful attention to his helm. The witnesses for the Grover and the Martin are positive that the Yuma sheered at the time and place indicated above and that the hard astarboard order then given was intended to overcome this sheer. They are, we think, corroborated by the inference to be drawn from the fact that the master of the Yuma saw nothing indicating danger, prior to this time, in the navigation of either the Grover or her consort. If, on the other hand, the Yuma did not sheer but held her course and speed until too late to avoid a collision, when it must have been apparent to any but a grossly inattentive master that the Martin was drifting into certain danger, the Yuma is equally culpable. The duty to take timely measures to avoid a collision was so obvious that we cannot believe it possible that so experienced a sailor as Captain Buie would have waited until the Martin had actually crossed his

course before acting. The conclusion reached by the District Court that the Yuma sheered is the more reasonable one.

It is unfortunate that the men who were best calculated to describe and characterize the conduct of the Martin, her master and mate, were both drowned, but we are not disposed to disturb the finding of the District Court that she was too far to westward. There seems to be little doubt that she was considerably nearer the American shore than the Grover. This is indicated not only by the testimony of the master of the Clint, but by the position of the wreck well to the westward of the range line. No reason is given why she should not have followed her steamer or directed her course more to the Canadian side of the river where the entire channel was clear. This was the wise and prudent course to pursue and we cannot say that the evidence fails to sustain the finding below that had the Martin taken it the collision would have been averted.

It is strenuously contended that to the Grover's unwarrantable conduct in electing to pass starboard to starboard and thereafter keeping upon the American instead of the Canadian side of the river was the initial fault to which all the others are attributable. The argument to sustain this theory is ingenious, persuasive and might be unanswerable were the Yuma in a position to assert it consistently. In August, 1900, the War Department, in view of the Fontana wreck at the head of the rapids, issued a notice to vessel masters directing down bound vessels to take the American side and up bound vessels to take the Canadian side of the channel. Had these directions been followed the Grover and Martin would have passed down to the westward, the Yuma would have passed up to the eastward of the range line and there would have been no possibility of collision. The rule was wise and salutary and should have been heeded, but we think the Grover cannot be charged with fault in failing to observe it, in view of the circumstances and conditions then existing. Rule 24 of the act of February 8, 1895, c. 64, relating to the St. Clair river (28 Stat. 645, 649 [U. S. Comp. St. 1901, pp. 2886, 2891]), gives the descending vessel the right of way and provides that she must "before the vessels shall have arrived within the distance of one-half of a mile of each other, give the signal necessary to indicate which side she elects to take." Rule 23 provides that two blasts of the whistle shall mean "I am directing my course to port." The Grover had the right of way. It was her duty to elect and signal the Yuma; this she did. The two blast signal gave notice to the Yuma that she intended to pass starboard to starboard. On hearing this signal the Yuma had two courses open to her; either to assent by responding with the same signal, or dissent as provided in Rule 26. She chose the former course and thereafter, as it seems to us, had no right to complain of the Grover for not electing to pass port to port. Having chosen to go to the left instead of the right it was plainly the duty of the Grover to go far enough to the left to give the Yuma ample room to pass without danger to any of the vessels concerned. There is some testimony that she could not have passed safely to the eastward of the range line above the Fontana wreck, but there is no reason why she should not have done so immediately after pass-

ing the wreck. With the entire Canadian side of the river open it might seem that the Grover took an unnecessary and unjustifiable risk in confining the theater of action for the three vessels to the American side of the river. The channel being only about 300 feet from the range line westerly, the Grover coming down approximately on the line and the Yuma being required to keep well out from the docks at night, the argument that the latter was improperly crowded has certainly more than conjecture on which to rest. But here, again, the Yuma's own testimony is absolutely inconsistent with the theory that the Grover gave her insufficient room in which to maneuver. The master of the Yuma says:

"I was following along the shore the usual course, safe distance off, and the Grover came on down past us a reasonable distance away, so much as to give me no anxiety in regard to her movements."

And, again, on cross-examination, he says:

"Between the channel bank and the Grover there was 300 feet of good deep navigable water and that was ample room in which to pass the Grover. There was no jeopardy so far as the Grover was concerned. There was no danger of collision with the Grover at all. * * * I took no action at any time with reference to the Grover either with my helm or my engine, there was no trouble between me and the Grover at all, passing."

He also testifies that if the Martin had kept upon the Grover's port quarter and had been properly handled the Yuma would have passed her as safely as she passed the Grover.

The court would hardly be warranted in holding that the Grover passed too near to the Yuma when the expert witnesses on both sides agree in asserting that there was ample room to pass.

It follows that the decree must be affirmed, but, as both parties have appealed, without costs in this court.

LACOMBE, Circuit Judge. I am of the opinion that in failing to direct navigation in conformity to the special notice issued by the War Department August 6, 1900, the towing steamer Maurice B. Grover acted without "any reasonable regard to safety," and should be inclined to hold her solely in fault for the consequences. But the pleadings do not charge her with failure to conform to the rule laid down in such notice, and as to all subsequent navigation of the three vessels I concur in the opinion of the court and vote to affirm. This concurrence is not to be taken as in any way assenting to the proposition that libelant, who was the first party to appeal from a decree in his favor in the District Court, is entitled to any interest subsequent to the date of such decree.